22

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## NORTHERN DIVISION

JASON NELSON,
JAMES STRAIGHT,

       Plaintiffs,

v.

STEVEN GOWDY,

      Defendant.

_____/

CASE NO. 03-CV-10116-BC

DISTRICT JUDGE DAVID M. LAWSON
MAGISTRATE JUDGE CHARLES E. BINDER

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
## ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
(Dkt. 13)

## I.    RECOMMENDATION

For the reasons stated herein, **IT IS RECOMMENDED** that Defendant's motion for summary judgment be **DENIED**.

## II.    REPORT

### A.    Introduction

By order of U.S. District Judge David M. Lawson, this case was referred to the undersigned Magistrate Judge for pretrial case management pursuant to 28 U.S.C. § 636(b)(1). (Dkt. 11.) Plaintiffs are inmates in the custody of the Michigan Department of Corrections ("MDOC"), and were both incarcerated at the Gus Harrison Correctional Facility ("ARF") in Adrian, Michigan, at all times pertinent to the allegations in the complaint.

Plaintiffs bring this *pro se* civil rights action pursuant to 42 U.S.C. § 1983, claiming that Defendant Gowdy retaliated against them for filing grievances against him and, in **Plaintiff** Nelson's case, for helping others to do so. The case is currently before the Court on Defendant's motion for summary judgment (Dkt. 13), to which Plaintiffs filed a response in opposition. (Dkt. 16.) Pursuant to Eastern District of Michigan Local Rule 7.1(e)(1), the motion is ready for Report and Recommendation without oral argument.

### B.   Factual Background[1]

In 1998, the MDOC issued an Individual Management Plan ("IMP") for Plaintiff James Straight based upon the determination that he suffers from a gender identity disorder. (Compl. at Ex. A.) The IMP provides that Plaintiff Straight is to be housed in a facility that "provides relative privacy in toilet and shower facilities" because Straight "feels uncomfortable undressing in front of other males," although he has "had no surgery and no breast development." (*Id.*) The IMP further provides that Straight is to be housed in a facility where he can receive "supportive psychotherapy" every three months. (*Id.*)

In the summer of 2002, Plaintiffs Straight and Nelson were both incarcerated in Housing Unit 5 of ARF. At that time, Defendant Gowdy was employed by the MDOC as a Resident Unit Officer (RUO), and he worked second shift (2 p.m. to 10 p.m.) in Housing Unit 5. (Dkt. 13, Gowdy Aff. ¶ 3.) The complaint alleges that on "numerous occasions" Defendant Gowdy "referred directly to Straight with demeaning and derogatory names (i.e., fag, dick-sucker, drag queen, prison fuck-boy, etc.)." (Compl. at 3.) In late July of 2002,

---

[1]This section is compiled from the factual allegations contained in the complaint and the MDOC documents that are attached to the complaint, to Defendant's motion, and to Plaintiffs' response.

Plaintiff Straight enlisted the help of another Unit 5 inmate, Kevin King, to submit two grievances on Straight's behalf against Defendant Gowdy for allegedly making these degrading and humiliating remarks. Both grievances were exhausted through Step III of the MDOC's grievance process. (Grievance Nos. ARF-02-08-1313-17h & ARF-02-08-1335-17c, Compl. at Exs. B & C.) One of the grievances was denied for being vague and including multiple issues (Plaintiff Straight also alleged in one of the grievances that Defendant Gowdy had violated MDOC policy by smoking in a non-smoking area), and the other was denied with the explanation that "the Grievant has not provided this office with sufficient information to substantiate his allegations or cast doubt on the word of staff, who denies the charges." (Compl. at Ex. C.)

On August 7, 2002, a short time after inmate King helped Plaintiff Straight prepare and submit his Step I grievances, King, who worked in the Unit 5 laundry, was unexpectedly moved to Housing Unit 1, which meant that he lost his laundry job. (Compl. ¶¶ 17-19.) King wrote to Assistant Deputy Warden ("ADW") Paul Klee, explaining that he believed he had been moved and his job taken away because he had assisted Straight in filing grievances. ADW Klee responded the following day that inmate King would be moved back to Unit 5 and reinstated to his laundry position. (Compl. at Ex. D.) On August 9, 2002, after King had been moved back to Unit 5, Defendant Gowdy allegedly "verbally threatened King with termination from his job assignment. Defendant openly voiced his displeasure with King having been returned to HU-5 after he (Defendant) had him moved." (Compl. ¶ 20.)

3

The following day, August 10, 2002, Defendant Gowdy completed a Work Evaluation form requesting that King be terminated from his job. Unit 5's Resident Unit Manager ("RUM") Charles Ingram, however, refused to sign off on the evaluation, and notified inmate King that he (Ingram) had "disposed of" the evaluation for three reasons: (1) because RUM Ingram had heard Defendant Gowdy threaten to have King fired from his work assignment due to King's getting himself transferred back to Unit 5 after RUO Gowdy had transferred him out of the unit; (2) because the allegations made by RUO Gowdy in the evaluation form were not "substantiated by any paperwork"; and (3) because no other staff members, when questioned, could recall observing any of the allegations made by RUO Gowdy in the evaluation. (Ingram Memo, Compl. at Ex. F.) RUM Ingram concluded the memo by stating that it appeared to him "that the CSJ-363 [evaluation form] was an act of retaliation by RUO Gowdy[]. . . ." (*Id.*) Following these incidents, inmate King informed Plaintiff Straight that he was no longer willing to help Straight with his grievances.[2] (Compl. ¶ 23.)

One week later, on August 17, 2002, Defendant Gowdy performed a "shakedown" search of Plaintiff Straight's cell. Plaintiff Straight alleges that immediately following the search, Defendant said to him, "the more you file, the more I'll shake you down and ride your

---

[2]King submitted grievances on his own behalf against RUO Gowdy, which were denied through Step III. (Compl. at Ex. G.) On December 27, 2002, King filed a prisoner civil rights suit against Gowdy alleging retaliation for exercising his First Amendment right to assist inmate James Straight in filing grievances against RUO Gowdy. (E.D. Mich. Case No. 02-CV-75136-DT, Dkt. 38, First Am. Compl.) The case was assigned to Chief Judge Bernard A. Friedman, and referred to Magistrate Judge Paul J. Komives for pretrial case management. On December 5, 2003, Magistrate Judge Komives granted King's request for appointment of counsel, and an attorney from Wayne State University Law School's Civil Rights Litigation Clinic was appointed to represent King. James Straight and Robert Nelson, the Plaintiffs in this case, are both listed as witnesses in King's case, and on July 28, 2004, Chief Judge Friedman entered an order allowing the depositions of Nelson, Straight, King, and one other inmate to be taken via telephone during the week of August 9, 2004.

4

ass." (Compl. ¶ 27.) Plaintiff Straight also states that, stemming from the search, Defendant

Gowdy charged him with a minor misconduct violation for possession of contraband, but

Plaintiff Straight was found not guilty of the charge at a subsequent hearing. Straight

submitted a grievance, drafted by Plaintiff Nelson, alleging that RUO Gowdy searched his

cell as an act of retaliation and wrote up the false misconduct report also in retaliation for the

grievances Straight had previously submitted against Gowdy that had been drafted by inmate

King. This grievance was denied all the way through Step III based on the following

reasoning:

> The officer has an obligation, per policy, to shake down cells during each
> active shift in which he works. It is not possible to instruct an officer to not
> conduct shakedowns for a concern that it will appear to be retaliation to the
> Grievant. There is no indication presented that allows this investigator to
> conclude that the shakedown was "targeted", as alleged by the Grievant. That
> leaves the described conversation that the Grievant alleges took place between
> he and Officer Gowdy, which the officer denies. The Grievant has failed to
> provide sufficient information, or witnesses, to substantiate his allegations or
> to cast doubt on the word of staff.

(Third Step Gr. Resp., ARF-02-08-1432-17b, Compl. at Ex. I.)

Two days later, on August 19, 2002, Plaintiff Nelson assisted Plaintiff Straight in

writing a letter to MDOC Regional Administrator Denise Quarles which stated among other

things that "RUO Gowdy openly calls prisoners fags, bitches, terrorist, scum" and asked for

someone to intervene and take corrective action. (Compl. Ex. H.) Plaintiff Straight received

a reply stating that his complaint letter had been forwarded to the Warden, who was

instructed to provide Plaintiff with a written response. (Compl. Ex. J.) On September 23,

2002, Warden Jamrog responded to Plaintiff Straight's letter, informing Plaintiff that his

5

"allegations of abusive conduct by this officer have been investigated and were found not to be substantiated." (Compl. Ex. K.)

The following day, September 24, 2002, Plaintiff Straight was charged with one minor and two major misconducts. Defendant Gowdy charged Plaintiff Straight with the minor misconduct violation of being "out of place for approx[imately] 2 minutes." (Minor Misc. Viol. & Hrng. Report, Dkt. 13 at Ex. 4.) Straight was found not guilty of this charge following a hearing. (See id.) The two major misconduct charges were lodged by another officer, RUO Goodin, although Plaintiff claims that Defendant Gowdy was directly involved in both incidents. In the first, Plaintiff was charged with being out of place. He was found not guilty by the hearing officer because another officer, ARUS Don Brussow, corroborated Plaintiff's version of events, which was inconsistent with Officer Goodin's statement of events. Nowhere in the charging document, the investigation documents, or the hearing report is Defendant Gowdy mentioned, however. (Dkt. 13 at Ex. 5.) The second major misconduct charged by Officer Goodin that day was for disobeying a direct order. At the hearing, Plaintiff Straight admitted that he refused to comply with RUO Goodin's order to return a lawnmower to the back yard tool building. (Dkt. 13 at Ex. 6.) However, Plaintiff Straight explained that the reason he refused was because RUO Gowdy, who allegedly had earlier threatened Straight with bodily harm, said he was going to escort Straight back to the tool building, and Straight was afraid for his safety. The hearing officer, nevertheless, considered all of the evidence and issued a four-page hearing report finding Plaintiff Straight guilty.

6

Plaintiff Nelson claims that after he began assisting Plaintiff Straight with his grievances, Defendant Gowdy started also referring to him as a "fag," and therefore Plaintiff Nelson submitted a grievance on September 30, 2002, against Defendant Gowdy. (Compl. ¶ 35.) Nelson's Step I grievance alleged in part the following:

> This grievance involves a slanderous, discriminatory comment made by Guard Gowdy. On the above date, Gowdy called prisoner El Hourani to the officer's station to discuss a grievance he (El Hourani) wrote pertaining to Gowdy. During this "discussion" Gowdy stated to El Hourani, "if you're a fag you can come out, its 2002." El Hourani asked Gowdy what he meant by this statement, Gowdy replied with, "I seen you sitting in the grass with NELSON . . . , so I just figured you must be a fag too." This ridiculously ignorant statement was spewed with the purpose of inclusively classifying ME as a fag.
>
> After numerous prisoners made the comment to me "I didn't know you were a fag," and prisoner El Hourani informing me of Gowdy's comments, I spoke personally to Gowdy about such comment. Upon the conclusion of said exchange, Gowdy simply refused to either admit or deny he made the statement.

(Grievance No. ARF-02-10-1653-17C, Dkt. 13 at Ex. 7.) The grievance was exhausted through Step III, and was denied at each step.

Prisoner El-Hourani also filed a grievance against Defendant Gowdy, and Defendant has attached to his motion a copy of an internal memorandum to the Grievance Coordinator describing the results of the internal investigation into the allegations in the grievance:

> RUM Ingram, RUO Gowdy, RUO Schroeder, prisoner El-Hourani #245799, prisoner King #171671, and prisoner Straight #211863 were interviewed in regards to this grievance. RUO Gowdy denied the El-Hourani's allegation that he responded by stating, "You are a fucking terrorist and a fag and will be dealt with." While none of the witnesses remembered this exact phrase, all remarked that RUO Gowdy had on this occasion and on several other occasions referred to El-Hourani as a terrorist. Based on this violation, RUO Gowdy will be handled administratively pursuant to Michigan Compiled Law,

7

Civil Service Commission Rules, and departmental policy as deemed appropriate by RUM Ingram.

(Memo., Dkt. 13 at Ex. 7.)

Plaintiff Nelson asserts that Defendant Gowdy retaliated against him for filing the September 30 grievance, as well as for providing assistance to Straight, by performing a shakedown of Plaintiff Nelson's cell on October 20, 2002, during which Defendant Gowdy allegedly destroyed numerous items belonging to Nelson, such as family photographs and grievance documents, by ripping them in half. (*See* Dkt. 13 at Ex. 8.) Plaintiff Nelson further alleges that, in addition to the torn personal items he found in his cell after the shakedown, Defendant Gowdy also left behind on Nelson's desk a threat that he had handwritten on a blank Step 1 grievance form, and then torn in half. (Compl. ¶ 39.) The message stated, "Try writing these and see the shakedowns." (Compl. Ex. N.)

Following the shakedown on October 20, 2002, Defendant RUO Gowdy prepared a Notice of Intent to Conduct an Administrative Hearing ("NOI") form with regard to Plaintiff Nelson, seeking to administratively transfer Nelson out of Unit 5. Defendant Gowdy wrote the following as the "reason for hearing":

> On 10-20-02 during a shakedown of prisoner Nelson #232162 cell 1 found letters written to him by Prisoner Straight #211863. These letters describe an existing sexual relationship between the two prisoners. Relationships of this nature adversly [sic] affect the good management of the Unit. Copies of letters attatched [sic], originals placed in HU5 contraband locker.

(NOI, Compl. at Ex. O.) As the "proposed disposition," Defendant Gowdy wrote, "Transfer prisoner Nelson to another unit or facility." (*Id.*)

8

A hearing on the NOI was held on October 24, 2002. The report indicates that Plaintiff Nelson's statement in response to the charges was, "They aren't my letters. They are from Straight to Kvam who rode out awhile ago. I was supposed to give them to him but forgot." (Admin. Hrng. Report, Compl. at Ex. P.) The hearing officer found that the letters constituted contraband pursuant to MDOC Policy Directive 05.03.118 (FF), and stated that they would be destroyed pursuant to Policy Directive 04.07.112, which allows for the destruction of personal property which is deemed contraband if destruction is requested by the prisoner. (*Id.*) Plaintiff Nelson points out that the hearing officer did not find him to be a threat to the good management of the unit or order his transfer. (Compl. ¶ 40.)

The following day, however, Plaintiff Nelson was moved out of Housing Unit 5. Nelson alleges that, as he was leaving, Defendant Gowdy said, "What, you're leaving your buddies back here all by themselves, who's gonna protect them now!" (Compl. ¶ 42.) Plaintiff Straight claims that after Nelson had left Unit 5, Defendant Gowdy stated to him, "Now what are you going to do, you ain't got Nelson to protect you," and "its [sic] amazing what a pen can do to these so-called legal beagles, so you better watch your ass Straight!" (Compl. ¶ 43.)

On October 27, 2002, Plaintiff Nelson submitted a grievance against Defendant Gowdy alleging that the October 20 cell search, the destruction of the personal property, and the threat written on the grievance form were all done by Defendant Gowdy in retaliation for the past grievances Nelson submitted against Gowdy on behalf of himself and Straight. The

9

grievance was denied through Step III, but the final grievance response indicates that some

form of administrative action was taken against Defendant Gowdy:

> . . . Cell shakedowns are a routine part of prison life and a responsibility of
> officers assigned to work in a housing unit. No evidence has been presented
> to substantiate the Grievant's allegation that the shakedown described was
> done as anything other than routine. That the Step Two respondent indicated
> that the issue would be reviewed again does not indicate an excessively vague
> response. It is an indication that the administration would take a careful
> second look at the issue and address any specific issues identified,
> administratively. Administrative decisions that involve staff are not shared
> with anyone other than the party directly involved and would not be discussed
> with others. **Staff at ARF has presented assurances that administrative
> action has been taken.** The information provided to this office does not
> substantiate the allegations made and because the information provided to this
> office does not support the Grievant's allegations, the Step Three Appeal is
> denied.

(Third Step Gr. Resp., Compl. at Ex. R (emphasis added).)

On October 30, 2002, Plaintiff Straight requested a transfer out of Unit 5 to get away

from Defendant Gowdy. Straight was allowed to transfer out, but only if he would sign a

waiver of the protections provided by his IMP. Straight asserts that he was so afraid of what

Defendant Gowdy might do, he signed the waiver in order to get the transfer. (Compl. ¶ 46.)

## C.   Defendant's Motion for Summary Judgment

### 1.   Motion Standards

Motions for summary judgment are governed by Rule 56(c) of the Federal Rules of

Civil Procedure, and will be granted when "there is no genuine issue as to any material fact

and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).

All facts and inferences must be viewed in the light most favorable to the non-moving party.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89

L. Ed. 2d 538 (1986). The moving party has the initial burden of showing the absence of a genuine issue of material fact as to an essential element of the non-movant's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citing *Celotex Corp. v Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). In determining whether the moving party has met its considerable burden, a court may consider the plausibility of the moving party's evidence. *Matsushita*, 475 U.S. at 587-88. Summary judgment is also proper where the moving party shows that the non-moving party is unable to meet its burden of proof. *Celotex*, 477 U.S. at 326.

In responding to a motion for summary judgment, the non-moving party cannot rest merely on the pleadings alone. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 191 L. Ed. 2d 202 (1986). Instead, the non-moving party has an obligation to present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). When the non-moving party fails to adequately respond to a summary judgment motion, a district court is not required to search the record to determine whether genuine issues of material fact exist. *Street*, 886 F.2d at 1479-80. Instead, the court may rely upon the "facts presented and designated by the moving party." *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 404 (6th Cir. 1992).

After examining the evidence designated by the parties, the court then determines "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown*

11

*& Williamson Tobacco Co.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). Summary judgment will not be granted "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.

## 2. Defendant's Arguments

Defendant Gowdy argues that he is entitled to summary judgment because the evidence refutes Plaintiffs' allegations of retaliation. (Dkt. 13, Br. in Supp. at 6.) Defendant Gowdy points to the fact that "Plaintiffs' grievances alleging that Gowdy's actions were retaliatory were never sustained, and defendant Gowdy was never disciplined for engaging in retaliatory acts." (*Id.* at 7.) Defendant claims that there is no evidence of adverse action, because although he charged both Plaintiffs with minor misconduct, they were both found not guilty and therefore they "suffered no adversity." (*Id.* at 8.) Finally, Defendant states that, "considering the number of grievances filed by plaintiffs, and the investigation conducted by MDOC officials, defendant submits that if there were any evidence of retaliatory conduct, he would have been disciplined." (*Id.*)

Alternatively, counsel for Defendant Gowdy asserts that he is entitled to summary judgment on the basis of qualified immunity, because the "evidence establishes that officer Gowdy acted in good-faith to enforce the prison's rules, as he understood them," and because "there is no evidence to support plaintiffs' conclusory assertions that defendant Gowdy's motive was retaliatory." (*Id.* at 10.)

Defendant Gowdy has attached to his motion an affidavit wherein he denies calling Plaintiff Straight "derogatory or demeaning names to his face or in conversations within

12

earshot of other prisoners." (Gowdy Aff., Dkt. 13, ¶ 8.) He also denies knowing that prisoner King was helping Straight file grievances, and states that his decision to move King out of Unit 5 was based on the fact that bed space was needed and King "was giving substandard performance as a laundryman, and had an argumentative attitude." (Gowdy Aff. ¶ 12.) Defendant Gowdy admits that after King was brought back to Unit 5 and returned to his laundry position, he stated that King would be terminated from his job. Gowdy avers, however, that this "was not a threat but simply the truth" based upon King's substandard performance. (Gowdy Aff. ¶ 14.) Gowdy asserts that all room searches were routine shakedowns performed in accordance with policy, and he denies making any threats or destroying any of Plaintiff Nelson's personal property. Finally, Defendant Gowdy states that he did not write the words "Try writing these and see the shakedowns" on the blank grievance form that Plaintiff claims to have found in his cell following the October 20, 2002, shakedown. (Gowdy Aff. ¶ 22.)

Attached to Defendant's motion is an MDOC "Notice of Disciplinary Conference" stating that Defendant Gowdy was alleged to have violated departmental work rules by destroying prisoner Nelson's personal items during a cell search as well as by leaving behind the written message "Try writing these and see the shakedowns" on a grievance form, and that a hearing on these allegations would take place on February 4, 2003. (Dkt. 13 at Ex. 10-2.)

Also attached to the motion is a memorandum setting forth the results of Defendant Gowdy's disciplinary conference, which is dated February 13, 2003. The memo states, "It

13

was determined that your behavior considered in Disciplinary Case #DS-02-29-0002-03 did not rise to the level of a rule violation. Therefore, the case has been dismissed." (Dkt. 13 at Ex. 10-1.) Notwithstanding this result, Defendant Gowdy reports in his affidavit that as of March 2003, he moved to third shift, gave up his RUO status, which was a level E-10 position, and since then has been "working at a C/O [Correction Officer] E-9 level." (Gowdy Aff. ¶¶ 3-4.)

### 3.    Discussion

In *Thaddeus-X v. Blatter*, 175 F.3d 378 (6th Cir. 1999) (en banc), the Sixth Circuit confirmed that "government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." *Id.* at 386. The court clarified that there are three elements to a claim of retaliation:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two – that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Id.* at 394.

### a.    Protected Conduct

The first element requires that Plaintiffs show that they engaged in conduct protected by law. When a prisoner alleges that his protected conduct was exercising his First Amendment right to file a grievance, this right is protected so long as the grievance was not frivolous. *Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). In this case, Defendant

14

Gowdy has not argued that he is entitled to summary judgment on the grounds that Plaintiffs failed to satisfy this element. I suggest that the evidence before the Court demonstrates that both Plaintiffs filed grievances which, although they were ultimately denied, raised non-frivolous allegations against Defendant Gowdy. Even the Step III Grievance Respondent noted in response to one of Plaintiff Straight's grievances that the allegations described a "very serious situation" which, if proven true, "could lead to disciplinary action against the officer." (Third Step Gr. Resp., No. ARF-02-08-1335-17c, Dkt. 13 at Ex. 1.) Moreover, Plaintiff Nelson's act of assisting Plaintiff Straight with the filing of grievances is also protected as a "derivative" of Straight's rights, because Nelson has alleged (*see* compl. ¶ 14) that Straight would have been unable to exercise his First Amendment right to file a grievance without such assistance. *Thaddeus-X*, 175 F.3d at 395; *Herron*, 203 F.3d 415-16.

## b.   Adverse Action

The second element, whether "adverse action" was taken against Plaintiffs, is where Defendant focuses his arguments for summary judgment. The term "adverse action" in this element is derived from retaliation cases arising in the public employment context. In those cases, adverse action could include discharge, refusal to hire, or failure to promote. *Thaddeus-X*, 175 F.3d at 396. In the prison context, the court explained,

an action comparable to transfer to administrative segregation would certainly be adverse. In order to determine whether actions of lesser severity merit being deemed "adverse" for purposes of a retaliation claim, we adopt the standard suggested by Judge Posner in *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982), that an adverse action is one that would "deter a person of ordinary firmness" from the exercise of the right at stake.

*Id.*

15

Defendant argues that Plaintiffs have "suffered no adversity." (Def.'s Mot., Dkt. 13, Br. at 8.) Defendant focuses on the fact that Plaintiffs were found not guilty of the minor misconducts he charged them with, and therefore they received no sanctions as a result of the charges. Defendant also argues that if he had taken adverse action against them, it would have been discovered by the MDOC's investigation and he would have been disciplined for engaging in retaliation. Since there is no evidence that he was disciplined for retaliation, Defendant argues that he is entitled to summary judgment.

I suggest that Defendant is taking too narrow a view of Plaintiffs' claims with regard to the "adverse actions" they allege were taken against them. Plaintiffs do not point just to the misconduct charges, but also: the cell "shakedown" searches; damaged personal items and grievance documents; the threatening note; harassment and verbal threats; the name-calling; the "psychological burden," "mental frustration," and humiliation suffered as a result of the name-calling; the transfer of the inmate who was assisting Straight in filing grievances against Defendant, which resulted in the withdrawal of that assistance; the false labeling of Nelson as a homosexual due to the NOI stating that he and Straight had a sexual relationship; and Straight's ultimate loss of the protections of his IMP.

In *Bell v. Johnson*, 308 F.3d 594 (6th Cir. 2002), the appeals court was presented with a prisoner retaliation claim that had been dismissed by the district court on the grounds that the prisoner had failed to present sufficient evidence to satisfy the second prong of the *Thaddeus-X* test. The court reversed, stating the following:

> Our discussion of the "adverse action" requirement in *Thaddeus-X* makes it clear that, in most cases, the question of whether an alleged retaliatory action

16

poses a sufficient deterrent threat to be actionable will not be amenable to resolution as a matter of law:

> We emphasize that while certain threats or deprivations are so *de minimis* that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregious retaliatory acts are allowed to proceed past summary judgment.

*Thaddeus-X*, 175 F.3d at 398 (emphasis added); *see also Bart*, 677 F.2d at 625. Thus, unless the claimed retaliatory action is truly "inconsequential," the plaintiff's claim should go to the jury. *Thaddeus-X*, 175 F.3d at 398.

*Bell*, 308 F.3d at 603. The court then reviewed several cases from other circuits where the

defendant's alleged actions were found sufficient to support a First Amendment retaliation

claim, such as *Hall v. Sutton*, 755 F.2d 786, 787-88 (11ᵗʰ Cir. 1985) (holding that inmate

alleged sufficient facts to state a claim of First Amendment retaliation based upon the alleged

confiscation of his tennis shoes in retaliation for a prior lawsuit against prison officials). The

court went on to explain that

> In [*Wright v. Newsome*, 795 F.2d 964, 968 (11ᵗʰ Cir. 1986)], the Eleventh Circuit determined that a prisoner had alleged sufficient injury to state a First Amendment retaliation claim by asserting that correctional officers conducted a retaliatory search of his cell and that "[i]n the course of the search, [the defendants] destroyed seven of [the plaintiff's] photographs and some legal papers . . . [and] also seized legal pleadings concerning [the plaintiff's] challenge to his conviction and a law book," which were never returned. *Wright*, 795 F.2d at 965. The court concluded that the plaintiff had "sufficiently alleged facts bringing actions that might not otherwise be offensive to the Constitution, such as the search itself or the confiscation and destruction of [legal and] nonlegal materials . . ., within the scope of the Constitution by alleging that the actions were taken in retaliation for filing lawsuits and administrative grievances." *Id*. at 968. Although *Wright* did not explicitly consider the "ordinary firmness" question, the court applied essentially the same well-established principles of First Amendment retaliation law that formed the basis for this court's decision in *Thaddeus-X*. In addition,

17

> we have previously suggested in dicta that a retaliatory cell search and seizure of an inmate's legal documents satisfies the adverse action prong of the *Thaddeus-X* test. *Walker v. Bain*, 257 F.3d 660, 664 (6th Cir. 2001), *cert. denied*, 535 U.S. 1095, 122 S. Ct. 2291, 152 L. Ed. 2d 1050 (2002).

*Id.* at 604.

In this case, the adverse actions alleged include false misconducts, retaliatory shakedowns, destruction of personal property, and more, as previously discussed. Moreover, the documentary evidence and the inferences that can be drawn therefrom, when viewed in a light most favorable to Plaintiffs, could be found to support the allegations. Pursuant to *Bell, supra,* I therefore suggest that the claimed retaliatory actions in this case are not "inconsequential," and that Defendant is not entitled to summary judgment on the basis that Plaintiffs have presented insufficient evidence on whether Defendant's actions could deter a person of ordinary firmness from engaging in protected conduct.

### c.    **Causal Connection**

The third and final element – a causal connection between the protected conduct and the adverse action – begins with the plaintiff bearing the "burden of establishing that his protected conduct was a motivating factor behind any harm." *Thaddeus-X*, 175 F.3d at 399. One way a plaintiff may meet this requirement is by pointing to circumstantial evidence such as "the timing of events or the disparate treatment of similarly situated individuals." *Id.* As one court in this district put it, the plaintiff "must allege a chronology of events from which retaliation may plausibly be inferred." *Hillside Productions, Inc. v. Duchane*, 249 F. Supp. 2d 880, 898 (E.D. Mich. 2003) (quotations omitted).

Defendant asserts that Plaintiffs have merely made "conclusory assertions that defendant Gowdy's motive was retaliatory." (Def.'s Mot., Dkt. 13, Br. at 10.)  While it is true that "[c]onclusory allegations of retaliatory motive 'with no concrete and relevant particulars' fail to raise a genuine issue of fact for trial," *Murray v. Unknown Evert*, 84 Fed. Appx. 553, 556 (6th Cir. 2003) (quoting *Salstrom v. Sumner*, No. 91-15689, 1992 WL 72881, at *1 (9th Cir. Apr. 10, 1992)), I suggest that Plaintiffs have done far more than make conclusory assertions.  To the contrary, they have alleged and provided evidence in support of numerous "concrete and relevant particulars," not the least of which concerns the written threat allegedly left in Plaintiff Nelson's cell following the October 20, 2002, shakedown.

Defendant Gowdy admits conducting the shakedown, but denies writing the threat or leaving it in the cell.  The MDOC's investigation states that "[t]he writing on the Grievance has been compared to other writings of RUO Gowdy and is inconclusive." (Dkt. 16 at Ex. F.)  Plaintiffs have attached as Exhibit H to their response both the threatening note and the NOI which was hand-written by Defendant Gowdy on the same day that the note was found. (Dkt. 16 at Ex. H.)  Although I do not profess to be an expert in handwriting comparisons, after examining the handwritten printing on the two documents, I find that it is not only possible but probable that a jury could find that the words "Try writing these and see the shakedowns" were written by Defendant Gowdy.  When one compares the capital "T"s, the lower case "y"s, and the word "the" which appears in both documents, I suggest that a very real likelihood exists for a jury to find that they are identical.  Further, the fact that this warning was written on a grievance form and specifically threatened future shakedowns in

retaliation for a prisoner exercising his First Amendment right to file such grievances, when taken in conjunction with the evidence that Defendant Gowdy was dealt with administratively, that another officer expressed in writing his opinion that Defendant's motivation for transferring inmate King to another unit was retaliation, and that Defendant's employment changed from a level 10 classification to a level 9 classification shortly thereafter, supports the conclusion that Plaintiffs have met their burden of establishing for purposes of this summary judgment motion that Defendant's actions with regard to Plaintiffs Nelson and Straight were motivated at least in part by the filing of grievances.

The court in *Thaddeus-X* described the next step in the analysis:

> Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.

*Thaddeus-X*, 175 F.3d at 399. In that case, the court noted that "defendants have done little more than deny the allegations put forth by plaintiffs" and concluded that "[s]uch is not sufficient to meet their burden under Federal Rule of Civil Procedure 56 to show affirmatively that there is no genuine issue in dispute." *Id.* Likewise, in this case, counsel for Defendant Gowdy states that Defendant "has shown that 'he would have taken the same action in the absence of the protected activity,'" (Dkt. 13, Br. at 7, quoting *Mount Healthy*), yet Defendant in his affidavit denies ever calling Plaintiffs any derogatory names (Aff. ¶ 8, 10, 21), denies making threatening statements (¶ 18), denies destroying documents or photos (¶ 23), and denies writing or leaving the grievance form threatening future shakedowns (¶¶

20

22-23). These denials of the facts alleged by Plaintiffs demonstrate that there are numerous material issues in dispute. Thus, as the court found in *Thaddeus-X*, I suggest that Defendant has failed to meet his burden of showing the absence of a genuine issue of material fact, and I accordingly suggest that he is not entitled to summary judgment. *See Street*, 886 F.2d at 1479.

### 4. Qualified Immunity

I likewise suggest denial of Defendant's alternative argument that he is entitled to summary judgment on the basis of qualified immunity. The Sixth Circuit has made it clear that, in the context of a qualified immunity defense, "[s]ummary judgment is not appropriate if there is a genuine factual dispute relating to whether the defendant[] committed acts that allegedly violated clearly established rights." *Dickerson v. McClellan*, 101 F.3d 1151, 1158 (6th Cir. 1996) (citing *Buckner v. Kilgore*, 36 F.3d 536, 540 (6th Cir. 1994)). Here, Plaintiffs had a clearly established right to not be retaliated against for filing grievances, *see Herron v. Harrison*, 203 F.3d 410 (6th Cir. 2000), and there is a genuine factual dispute regarding whether Defendant Gowdy committed many of the retaliatory acts alleged by Plaintiffs. Accordingly, I suggest that Defendant is not entitled to qualified immunity.

### III. REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further

right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

CHARLES E. BINDER
United States Magistrate Judge

DATED: August 31, 2004

Copies to:  Jason Nelson, #232162, Gus Harrison Correctional Facility, 2727 Beecher Street, P. O. Box 1888, Adrian, MI 49221
James Straight, #211863, Gus Harrison Correctional Facility, 2727 Beecher Street, P. O. Box 1888, Adrian, MI 49221
Christine M. Campbell, Michigan Department of Attorney General, Corrections Division, P. O. Box 30217, Lansing, MI 48909
Honorable David M. Lawson, United States District Judge